UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CECILIA W. WILLIAMS,            )
                                )
              Plaintiff,        )
                                )
         v.                     )    No.  4:07CV1094 FRB
                                )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,             )
                                )
              Defendant.        )


## MEMORANDUM AND ORDER

This cause is before the Court on appeal of an adverse ruling of the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

### I.  Procedural History

On October 6, 2005, plaintiff Cecilia W. Williams filed an application for Supplemental Security Income (SSI) pursuant to Title XVII, 42 U.S.C. §§ 1385, et seq., in which plaintiff claimed she became disabled on July 5, 2005.  (Tr. 125-28.)  On initial consideration, the Social Security Administration denied plaintiff's claim for benefits.  (Tr. 110-15.)  On September 26, 2006, a hearing was held before an Administrative Law Judge (ALJ).  (Tr. 20-46.)  Plaintiff testified and was represented by counsel.  A vocational expert also testified at the hearing.  On December 27, 2006, the ALJ issued a decision denying plaintiff's claim for benefits.  (Tr. 7-19.)  On May 12, 2007, the Appeals Council denied

plaintiff's request for review of the ALJ's decision.  (Tr. 2-5.)
The ALJ's determination thus stands as the final decision of the
Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on September 26, 2006, plaintiff testified
in response to questions posed by the ALJ and counsel.  Plaintiff
is thirty-seven years of age.  (Tr. 22.)  Plaintiff stopped her
schooling in the seventh grade and did not obtain her GED.  (Tr.
23.)  Plaintiff testified that her weight fluctuates but that she
currently weighs 159 pounds, which is the most she has ever
weighed.  (Tr. 31-32.)

In her Vocational Report, plaintiff reported that from
March to November 2001, she worked as a cashier at a country club.
From March to November 2003, plaintiff worked as a store manager at
a convenience store.  Plaintiff also worked in March 2003 as a
cashier at a different convenience store.  In February and March
2004, plaintiff worked as a cashier at Midwest Petroleum Company.
In April and May 2004, plaintiff worked as a waitress at a country
club.  In June 2004, plaintiff worked as a waitress in a
restaurant.  In September 2004, plaintiff worked as a cashier at a
gas station.  From May to August 2005, plaintiff worked as a
laundry and locker room attendant at Gateway Equipment Company.
(Tr. 191.)  Plaintiff testified that in 2005, she also worked at a

gas station for three weeks and at a pizza restaurant for one month. (Tr. 23-24.) Plaintiff also testified that during the second quarter of 2006, she worked at Gateway Building Maintenance washing laundry and wiping down lockers. (Tr. 25.)[1]

Plaintiff testified that she suffers from an intestinal disease which makes her miserable. Plaintiff testified that she is in constant pain and that the pain radiates from her abdomen to her back and side. Plaintiff testified that she also experiences frequent diarrhea and vomiting and is sometimes incontinent. (Tr. 26.) Plaintiff testified that it is difficult for her to eat because she gets sick when she eats. (Tr. 27.) Plaintiff testified that between November and December 2005, she lost twenty-five pounds because she had core bacteria in her intestines and could not eat or keep food down. (Tr. 32-33.) Plaintiff testified that her intestinal condition causes significant abdominal bloating which makes it appear as though she is pregnant. Plaintiff testified that she must wear her husband's tee-shirts and cannot wear her own clothes because of such bloating. (Tr. 33.)

Plaintiff testified that she also frequently has pneumonia and suffers from colds, ear infections and sinus infections. (Tr. 26-27.)

Plaintiff testified that she suffers seizures when she

---

[1]As noted by the ALJ in his decision (Tr. 14 n.1), the record shows plaintiff to have actually performed this work during the third quarter of 2005 (Tr. 119).

- 3 -

gets extremely nervous and is placed under a lot of pressure. (Tr. 27.) Plaintiff testified that she also gets short of breath when she is nervous. (Tr. 28.) Plaintiff testified that she is nervous and has panic attacks when she is around a group of people in that she does not know what to say and is afraid that she will sound stupid. Plaintiff testified that she also breaks out in a sweat with such panic attacks. (Tr. 34.) Plaintiff testified that she gets irritated easily when she communicates with people and has "blown up" at people on the job. (Tr. 27, 30-31.) Plaintiff testified that she has suffered from a psychological condition since she was a child, and that she saw psychiatrists when she was a child but did not obtain any help from them. Plaintiff testified that since March 2005, she has not seen a psychiatrist or psychologist for any treatment or evaluation other than consultative examinations for disability determination. Plaintiff testified that she does not take any medication for her mental condition. (Tr. 29.)

Plaintiff also testified that she experiences headaches all day every day but does not take medication for them. (Tr. 27-28.) Plaintiff testified that she cannot take medication because of absorption problems in her stomach and that taking such medication would worsen her stomach condition. (Tr. 28.) Plaintiff testified that she cannot take even pain medication and that her only medication is Dilantin. (Tr. 29, 35.) Plaintiff

testified, however, that she received pain medication the previous day at a hospital. (Tr. 35-36.) Plaintiff testified that whatever medication she has taken, it has not provided relief to her. (Tr. 37.)

Plaintiff testified that she recently suffered a torn rotator cuff in the left shoulder which causes her pain. (Tr. 36.)

Plaintiff testified that she smokes one to two packs of cigarettes a day, depending on the stress level of the day. (Tr. 27.) Plaintiff testified that her doctors have advised her that smoking can be a factor in her shortness of breath. (Tr. 28.)

Plaintiff testified that she spends a lot of time in bed. (Tr. 27.) Plaintiff testified that she is sleepy all of the time and naps throughout the day. (Tr. 37.) Plaintiff testified that she does not sleep well at night because of her anxiety and pain. (Tr. 35.) Plaintiff testified that she plays handheld electronic games during the day and listens to the radio. Plaintiff testified that she seldom watches television because television shows and movies usually do not interest her. (Tr. 37-38.) Plaintiff testified that she sometimes reads but skips over a lot of material because she is not the greatest reader. (Tr. 38.) Plaintiff testified that she used to enjoy going for walks but that the pain with her physical condition now prevents such activity. Plaintiff testified that she visits her mother-in-law and father-in-law quite often because they live next door to her. (Tr. 39.) Plaintiff

testified that she usually sits and talks with her mother-in-law or watches a movie with her, although she usually falls asleep. (Tr. 39-40.)

Plaintiff testified that her doctor, Dr. Swaroop, advised her that she has a condition whereby if she engages in certain activity, the condition "feeds off the activity and it actually causes . . . the problems with [her] stomach and stuff to be worse." (Tr. 29-30.) Plaintiff testified that her doctor told her not to engage in lifting inasmuch as it pulls on her stomach. (Tr. 30.) Plaintiff testified that she has problems bending over with her distended stomach and cannot tie shoes because of it. Plaintiff testified that the distention in her stomach also causes pain in her back and sides because of the pulling sensation. (Tr. 36.)

Plaintiff testified that she never underwent a functional assessment with her doctor whereby her doctor determined how long she could stand or sit or how much weight plaintiff could lift. (Tr. 30.)

B.   Testimony of Vocational Expert

Dr. Jeff Magrowski, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

The ALJ first asked Dr. Magrowski to assume an individual who had no past relevant work at the substantial gainful activity level and whose current impairment "preclude[d] any exposure to

hazardous work settings, unprotected heights and dangerous and/or moving machinery and performing more than simple, repetitive work." (Tr. 40.) Dr. Magrowski testified that such an individual could perform numerous jobs such as sedentary table work, of which there were in excess of 1,000 in the State of Missouri and 25,000 nationally; and light cleaning work/housekeeping, of which there were in excess of 3,000 in the state and 200,000 nationally. (Tr. 41.)

The ALJ then asked Dr. Magrowski to assume an individual of plaintiff's age and education and that such individual could

> lift and carry up to 50 pounds occasionally, 25 pounds frequently, can sit for six hours out of eight, stand or walk for six hours out of eight, can occasionally climb stairs or ramps, never ropes, ladders or scaffolds and should avoid concentrated exposure to the hazardous moving and dangerous machinery. She can perform work in a low stress environment away from the general public and can perform one and two step jobs on a sustained basis.

(Tr. 41-42.)

Dr. Magrowski testified that such a person could perform the previous jobs mentioned as well as the job of packer, which has a light exertional level and of which there exist more than 2,000 in the State of Missouri and 200,000 nationally; and childcare attendant, which has an exertional level of medium and of which 2,000 jobs existed in the State of Missouri, and one million nationally. (Tr. 42.)

The ALJ then asked Dr. Magrowski to assume an individual who "can lift and carry up to 20 pounds occasionally, ten pounds frequently, sit for two hours out of eight, stand or walk for less than two hours out of eight, can occasionally climb stairs and ramps, ropes, ladders and scaffolds and can rarely crouch or kneel and is capable of performing a low stress job." Dr. Magrowski testified that such a person would be limited to part-time work given the limited duration of both sitting and standing/walking. (Tr. 42-43.)

Plaintiff's counsel asked Dr. Magrowski to consider the claimant from the first hypothetical and to consider that such claimant had an IQ of 75 and had multiple moderate limitations in her ability to understand, remember and carry out detailed instructions; to maintain concentration and attention for extended periods; to work in coordination and proximity to others without being distracted by them; to complete a normal work day and work week without interruptions from her psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instruction and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 43-44.) Dr. Magrowski testified that, depending upon the definition of "moderate," such limitations could affect the person's ability to work in the jobs previously

identified, especially with the moderate limitations in concentration, persistence and pace. (Tr. 44-45.)

Counsel then asked Dr. Magrowski to add to the hypothetical that such a person would be markedly impaired in her ability to cope with stress and pressures of routine work activities. Dr. Magrowski responded that such a person could not maintain any job from a vocational standpoint. (Tr. 45-46.)

### III.  Medical Records

On January 18, 2005, plaintiff was admitted to Jefferson Memorial Hospital complaining of seizure activity. Plaintiff's history of seizures was noted. It was also noted that plaintiff was taking Neurontin[2] for the condition. Plaintiff reported having had an argument with her teenage children and that she then had a seizure lasting about twenty minutes. Dr. John McGarry noted that he had initially seen plaintiff in 1999 at which time she reported having had seizure activity since age fifteen. Plaintiff currently reported to Dr. McGarry that she had experienced headaches during the previous few days but had not had any migraines for two or three years. Plaintiff also reported not having any seizure activity or loss of consciousness within the previous four years. Plaintiff reported that she quit smoking one year prior.

_____

[2]Neurontin (Gabapentin) is used to help control certain types of seizures in patients who have epilepsy. Medline Plus (last revised July 1, 2006)<http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a694007.html>.

Plaintiff's current medications were noted to include Tegretol,[3] Valium[4] and Neurontin. It was not clear to Dr. McGarry whether plaintiff had taken any Neurontin within the past year. Plaintiff reported frequent diarrhea and that she had previously been diagnosed with ulcerative colitis. Plaintiff reported that she slept well. Plaintiff reported experiencing anxiety with her children. Physical examination was unremarkable. Plaintiff was given differential diagnoses of pseudoseizure and true seizure. Dr. McGarry determined not to start anticonvulsant treatment unless the results of EEG were abnormal. Carbamazepine was discontinued. Dr. McGarry opined that a psychiatric consult may be beneficial. (Tr. 343-48.)

On February 17, 2005, plaintiff was admitted to the emergency room at Jefferson Memorial Hospital with complaints of chest pain. Nausea and shortness of breath were also present. Plaintiff also reported that she experienced swelling in the left ankle and pain in her left leg. (Tr. 340-42.) An ultrasound of the left leg showed no evidence of deep vein thrombosis. Results of chest x-rays were normal. (Tr. 359.) An EKG showed sinus tachychardia with a noted increase in rate when compared to an EKG performed one month prior. (Tr. 357.) Plaintiff was given

_____

[3]Tegretol (Carbamazepine) is indicated for use as an anti-convulsant drug. Physicians' Desk Reference 2220 (55th ed. 2001).

[4]Valium is indicated for the management of anxiety disorders. Physicians' Desk Reference 2814 (55th ed. 2001).

medication and discharged that same date. (Tr. 340.)

A chest x-ray taken on May 19, 2005, in relation to an employment physical was normal. (Tr. 339.)

On May 27, 2005, plaintiff visited Lottie L. Block, Advanced Practical Registered Nurse, at Quality Healthcare, Inc. Nurse Block noted that plaintiff had not been in the office for over a year. Plaintiff reported that she started a job at Doe Run Company and that she walked all day long at work. Plaintiff reported that it was a long drive for her to come to the office. Plaintiff reported that she had not had a seizure since September 2004 and that she had been out of her Neurontin for a while. Plaintiff reported that she had experienced weight gain since her hysterectomy in September 2004. Plaintiff's weight was noted to be 170 pounds, which represented a nine-pound weight gain. Plaintiff reported that she was not comfortable with her gastroenterologist and requested a different referral. Plaintiff complained of chronic abdominal pain, cramping and chronic diarrhea. It was noted that plaintiff had previously been taking Asacol[5] but that she was out of the medication. Plaintiff requested more Asacol. Plaintiff reported that she quit smoking two years prior. Plaintiff denied any headaches, frequent ear infections or nasal occlusion. Plaintiff denied any shortness of breath. Physical

_____

[5]Asacol is indicated for the treatment of mildly to moderately active ulcerative colitis and for the maintenance of remission of ulcerative colitis. Physicians' Desk Reference 2669-70 (55th ed. 2001).

examination of plaintiff's abdomen showed it to be obese and soft. Bowel sounds were noted to be hyperactive in all four quadrants. No masses or organomegaly were noted. Plaintiff was diagnosed with hyperlipidemia and was instructed to continue with a low fat diet. Plaintiff was also diagnosed with ulcerative colitis. Asacol was prescribed and plaintiff was referred to a different gastroenterologist. Plaintiff was also diagnosed with seizure disorder for which Neurontin was prescribed. As for plaintiff's weight gain and fatigue, thyroid laboratory testing was ordered. (Tr. 366-68.)

Plaintiff returned to Nurse Block on June 8, 2005. Plaintiff reported that her ulcerative colitis had improved with Asacol, but that she had been experiencing headaches which caused her to vomit the previous day. Plaintiff reported that she used to take Neurontin for headaches but that the medication no longer helped. Plaintiff reported that she has also experienced midsternal chest pain with associated diaphoresis radiating into her neck and left arm. Plaintiff reported that she experienced the pain sometimes with activity, the most recent episode occurring while she was washing dishes. Nurse Block determined to order a cardiolyte stress test. Plaintiff was diagnosed with migraine cephalgia and was instructed to take Elavil[6] and Motrin. Plaintiff

_____

[6]Elavil (Amitriptyline) is used for the relief of symptoms of depression, <u>Physicians' Desk Reference</u> 626 (55th ed. 2001), but is also sometimes used to treat eating disorders and post-herpetic neuralgia, <u>Medline Plus</u> (last reviewed Aug. 1, 2007)<http:

was given Mevacor for her high cholesterol. It was also noted that plaintiff had gained two pounds. Plaintiff was instructed to increase her physical activity and to walk thirty minutes a day. (Tr. 364-65.)

On June 14, 2005, plaintiff underwent a cardiac ischemia evaluation in response to her complaints of chest pain, irregular heart beat and difficulty breathing. The evaluation showed no evidence for fixed or reversible ischemia. (Tr. 338.) A treadmill stress test performed that same date was negative. (Tr. 337.)

On June 30, 2005, plaintiff was admitted to the emergency room at Jefferson Memorial Hospital. Plaintiff was noted to be lethargic and to have slurred speech. (Tr. 332-33.) Plaintiff's current medications were noted to include Amitriptyline, Gabapentin (Neurontin), Phentermine,[7] Asacol, and Ibuprofen. Plaintiff currently complained of headaches, phono photophobia and neck pain. Plaintiff had no shortness of breath, chest pain or abdominal pain. Occasional paresthesias of the left hand was noted. (Tr. 332.) Plaintiff reported to Dr. McGarry that she had had an argument with her sixteen-year-old son during which she called the police. Plaintiff reported that while talking with the police, she began experiencing seizure activity and ultimately lost consciousness.

_____

//www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html>.

[7]Phentermine is used, in combination with diet and exercise, to help lose weight. It works by decreasing appetite. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682187.html>.

It was noted that plaintiff was given Dilantin[8] and Ativan[9] in the emergency room. Plaintiff reported getting daily headaches when she is under stress. Plaintiff reported occasional lightheadedness and intermittent numbness on the left side. (Tr. 334.) Plaintiff reported having bowel movements three times a day and that she had been previously diagnosed with an ulcer. Plaintiff reported sleeping well but that she was under a lot of stress with her children. Mental status examination was normal. Neurological examination was normal. Physical examination was normal. (Tr. 334-35.) Dr. McGarry opined that the perceived seizure did not sound like an epileptic event. Plaintiff was given the differential diagnoses of syncope, anxiety and cardiac arrhythmia. Dr. McGarry noted that seizure activity appeared less likely. It was determined that plaintiff would discontinue taking anti-convulsive medication. An EEG was ordered. (Tr. 336.)

Plaintiff returned to Nurse Block on July 13, 2005, and reported that she had experienced seizure activity the previous week which resulted in hospitalization. Plaintiff reported that

---

[8]Dilantin is indicated for the control of generalized tonic-clonic (grand mal) seizures. Physicians' Desk Reference 2427 (55th ed. 2001).

[9]Ativan is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety or anxiety associated with depressive symptoms. Physicians' Desk Reference 3348 (55th ed. 2001).

she was placed on Topamax[10] but that her insurance did not cover the medication. Plaintiff also reported that her husband advised her that she experiences seizure activity in her sleep as well. It was noted that plaintiff had lost fifteen pounds since the last examination. Plaintiff reported that she had been eating healthy and that she walked twelve hours a day at work. Plaintiff complained of continued abdominal cramping and that the Asacol was no longer providing relief. Plaintiff also reported continued migraine headaches experienced daily. Plaintiff was diagnosed with benign intracranial hypertension, migraines, hyperlipidemia, seizure activity, and ulcerative colitis. Plaintiff was instructed to stop taking Asacol and Topamax and was prescribed Inderal[11] and Sulfasalazine.[12] Plaintiff's prescription for Amitriptyline was refilled. A sleep study was ordered. Plaintiff was instructed to continue with her exercise. (Tr. 362-63.)

On July 20, 2005, plaintiff underwent a sleep study at Jefferson Memorial Hospital, the results of which showed possible nocturnal seizure disorder. Dr. W. Mark Breite recommended that

---

[10]Topamax is indicated as adjunctive therapy for adults with partial onset seizures, or primary generalized tonic-clonic seizures. Physicians' Desk Reference 2391-93 (55th ed. 2001).

[11]Inderal is indicated in the management of hypertension, migraine, essential tremor, and stress-induced angina. Physicians' Desk Reference 3377-78 (55th ed. 2001).

[12]Sulfasalazine is used to treat bowel inflammation, diarrhea, rectal bleeding, and abdominal pain in patients with ulcerative colitis. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682204.html>.

plaintiff be referred for a neurologic work-up. (Tr. 329-30.)

Plaintiff was admitted to the emergency room at Jefferson Memorial Hospital on August 3, 2005, after staff at her work reported that she was staring and then became rigid. Plaintiff could not recall the event. Plaintiff reported having a headache that felt like a migraine. It was noted that plaintiff had not taken her recent doses of seizure medication. Plaintiff reported that she had not taken Neurontin for one year because she did not like the way it made her feel. Physical examination showed mild diffuse tenderness of the abdomen. Plaintiff was diagnosed with headache and near syncope. After an hour and a half in the emergency room, plaintiff decided to leave without further treatment. (Tr. 326-28.)

On August 7, 2005, plaintiff was admitted to the emergency room at Jefferson Memorial Hospital complaining of abdominal pain. (Tr. 325.)

Plaintiff returned to the emergency room with abdominal pain on August 12, 2005. Plaintiff reported that she had experienced abdominal pain for one month but that the pain had worsened during the previous weeks. Plaintiff reported that she had lost thirty pounds in one month. Plaintiff also reported having nausea, vomiting and diarrhea for one month. CT scans performed of plaintiff's abdomen and pelvis showed minimal bibasilar atelectasis. No evidence of colitis was seen, nor were

there any intra-abdominal abscess formations. (Tr. 353-54.) Plaintiff was given Percocet[13] and Compazine[14] and was discharged that same date in stable condition. (Tr. 322-24.)

Plaintiff was admitted to Mineral Area Hospital on August 16, 2005, for complaints of worsening abdominal pain, diarrhea, bloody stools, and increased weakness. Plaintiff reported that the abdominal pain radiated to her back. Plaintiff also reported vomiting during the previous twenty-four hours. (Tr. 299-305, 306-09, 310.) Initial stool cultures were positive for salmonella cryptosporidium shigella and enterobacter. (Tr. 301, 306-09, 310.) An obstructive series yielded unremarkable results. (Tr. 321.) Final reports of the stool cultures showed no salmonella, shigella, e. coli, or staph aureus but were positive for enterobacter cloacae. (Tr. 310, 315.) An EGD showed mild gastritis and small hiatal hernia. (Tr. 297-98, 310.) Plaintiff's condition improved during her hospitalization and she was discharged on August 18, 2005, in stable condition. Plaintiff's discharge diagnoses were abdominal pain, bloody diarrhea, nausea, vomiting, dehydration,

---

[13]Percocet is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1211 (55th ed. 2001).

[14]Compazine is used to treat nausea and vomiting caused by various conditions. Medline Plus (last revised Aug. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682116.html>.

hypokalemia, tobacco abuse,[15] rheumatoid arthritis, and positive stool cultures for enterobacter cloacae. Plaintiff was given Flagyl[16] upon discharge and was scheduled for a colonoscopy. (Tr. 310.)

On August 19, 2005, plaintiff returned to Nurse Block who noted plaintiff to have just been released from Mineral Area Hospital where she was admitted for bloody stools. Plaintiff reported constantly feeling nauseous. Nurse Block noted plaintiff's stool cultures to have tested positive for "campylobacter shigella saminella" [sic]. (Tr. 360.) Plaintiff reported that her family and in-laws had been sick as well and that they share the same well water. It was noted that plaintiff had been placed on Flagyl. It was also noted that an EGD showed mild gastritis and a small hiatal hernia. Plaintiff reported that Neurontin did not agree with her and she requested Depakote.[17] Nurse Block noted plaintiff to have lost seven pounds since her last examination. Plaintiff was diagnosed with amebic dysentery, gastritis, hiatal hernia, ulcerative colitis, and seizure activity.

_____

[15]Plaintiff reported that she had been smoking daily for the past fifteen years. (Tr. 306.)

[16]Flagyl eliminates bacteria and other microorganisms that cause infections of the gastrointestinal tract. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689011.html>.

[17]Depakote is used to treat certain types of seizures as well as to prevent migraine headaches. Medline Plus (last revised June 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682412.html>.

Plaintiff was prescribed Depakote, Reglan[18] and Zantac[19] and was instructed to continue with a bland diet. Plaintiff was instructed on smoking cessation and was also advised to have her well water inspected. (Tr. 360-61.)

On August 23, 2005, plaintiff returned to the emergency room at Mineral Area Hospital complaining of an abrupt onset of abdominal pain. Plaintiff reported having experienced the pain and nausea since the previous night. Plaintiff reported shortness of breath and complained that breathing and walking increased the pain. Plaintiff reported her recent bowel movements to have been normal. Increased tenderness was noted about the abdomen with severe guarding. Plaintiff rated her pain at a level ten on a scale of one to ten. Plaintiff was administered intravenous medications. After two hours in the emergency room, plaintiff determined to leave, stating that her pain was better and she did not want to stay. (Tr. 290-95.) An obstructive series performed that same date yielded unremarkable results. (Tr. 320.)

On August 29, 2005, plaintiff underwent a total colonoscopy with biopsy in response to her complaints of rectal

_____

[18]Reglan is used to relieve nausea and vomiting, heartburn, stomach pain, and bloating. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a6840 35.html>.

[19]Zantac is used to treat ulcers, gastroesophageal reflux disease, and conditions where the stomach produces too much acid. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/ medlineplus/druginfo/medmaster/a601106.html>.

bleeding. No pathologic diagnosis was made regarding the small intestine, terminal ileum. However, biopsy of the colon, rectosigmoid showed very focal active colitis. There was no active bleeding observed. (Tr. 286-89.)

An obstructive series performed on November 20, 2005, showed considerable fecal stasis[20] but no obstructive changes. (Tr. 228.)

On November 22, 2005, plaintiff visited Dr. Prabhakar Swaroop at St. Louis University's Division of Gastroenterology and Hepatology in relation to her complaints of abdominal pain and bloating. Plaintiff also reported a seven-year history of alternating diarrhea and constipation. Plaintiff reported that she had been diagnosed with ulcerative colitis two years prior but that medication did not provide any benefit. Plaintiff reported that her most recent colonoscopy performed in August 2005 showed blockage of the bowel. Plaintiff reported a twenty-year history of tobacco use. Plaintiff reported experiencing fatigue and increased weight gain. Plaintiff currently weighed 166 pounds. Plaintiff also reported experiencing headaches and seizures, as well as having muscle pain in her legs. Physical examination showed plaintiff's abdomen to be mildly distended with mild and diffuse

---

[20]"Stoppage of the normal flow of a body substance, as of blood through an artery or of intestinal contents through the bowels." *The American Heritage® Stedman's Medical Dictionary*. Houghton Mifflin Company (Sept. 29, 2008)<Dictionary.com http://dictionary.reference.com/browse/stasis>.

tenderness about the left upper quadrant. Dr. Swaroop diagnosed plaintiff with inflammatory bowel disease and questioned whether it represented ulcerative colitis or Crohn's disease. A colonoscopy and laboratory testing were ordered. (Tr. 243-45.)

On November 23, 2005, plaintiff underwent endoscopy and biopsy at St. Louis University Hospital which showed no pathologic diagnosis of the small intestine. Lymphocytic colitis of the colon, rectum was observed; however, the biopsy had neither architectural nor inflammatory features of inflammatory colitis. (Tr. 260-61.)

On December 1, 2005, plaintiff underwent an x-ray of the small bowel in response to her complaints of recurring diarrhea and abdominal pain. The x-ray showed abnormal configuration of the small bowel with findings suggesting malabsorption – most likely gluten enteropathy versus nontropical sprue. (Tr. 280.)

On December 13, 2005, plaintiff returned to Dr. Swaroop for follow up examination. Plaintiff continued to complain of abdominal pain, bloating and alternating diarrhea and constipation. It was noted that plaintiff weighed 141 pounds. Dr. Swaroop noted the colonoscopy of November 2003 to have resulted in a diagnosis of lymphocytic colitis. Plaintiff also complained of headaches. Physical examination of the abdomen showed mild diffuse tenderness with no masses. Psychological assessment was normal. Plaintiff

was given and prescribed Entocort[21] and was instructed to return in one month for follow up.  (Tr. 238-40.)

On February 9, 2006, plaintiff underwent a psychological consultation for disability determinations.  Plaintiff reported that she had been a sickly child and was diagnosed with rheumatoid arthritis at age nine.  Plaintiff reported that she was raised primarily by her maternal grandparents and had attempted suicide at age fifteen after her grandfather's traumatic death.  Plaintiff reported that she had been diagnosed as learning disabled and dropped out of school after the seventh grade.[22]  Plaintiff reported that she had never been regularly employed, had not worked for about one year, and was not actively seeking employment due to health problems.  Plaintiff's physical medical history was noted. Plaintiff reported obtaining minimal benefit from her medications. Plaintiff reported being married for sixteen years and having four teenage children.  Plaintiff reported considerable stress relative to parent/child problems.  Plaintiff reported being socially inactive due to health problems and that she led a sedentary life. Plaintiff reported doing some light housekeeping and indicated that

---

[21]Entocort is used to treat Crohn's disease (a condition in which the body attacks the lining of the digestive tract, causing pain, diarrhea, weight loss, and fever).  <u>Medline Plus</u> (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a608007.html>.

[22]Records show that in 1983, at age 14, plaintiff obtained the following IQ scores:  verbal, 75; performance, 85; full scale, 78. (Tr. 76.)

she fatigues easily. Mental status examination showed plaintiff to be tense and anxious with limited eye contact. Plaintiff appeared extremely self-conscious and giggled nervously at times. Plaintiff denied symptoms of psychosis or major depression, but admitted to feeling extremely insecure. Dr. Kenneth G. Mayfield noted there to be symptoms of Obsessive Compulsive Disorder. Dr. Mayfield noted there to be indications for mental health intervention. Plaintiff's capacity for sustained concentration and attention appeared intact. Dr. Mayfield opined that plaintiff appeared to be of average to above average intelligence despite her limited education. Plaintiff was noted to be well-spoken and knowledgeable and to have intact judgment. Dr. Mayfield diagnosed plaintiff with Anxiety Disorder due to multiple health problems, with Obsessive Compulsive symptoms; history of learning disability; and ulcerative colitis, gastrointestinal disease, and stress-related seizures. Dr. Mayfield assigned a Global Assessment of Functioning (GAF) score of 55.[23] (Tr. 283-85.) Upon conclusion of the evaluation, Dr. Mayfield reported:

Current level of daily functioning reveals the

---

[23]A GAF (Global Assessment of Functioning) score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

client's ability to relate to others is
borderline intact.  There are, however,
indications of considerable social isolation
and constriction of interests and habits.  She
is able to care for basic personal needs.  She
is able to understand and follow directions
and her capacity for sustained concentration
and attention appears intact.  Ability to cope
with stress and pressures of routine work
activities is, however, seen as markedly
impaired.  She is otherwise capable of
comprehending and following basic personal and
financial affairs.

(Tr. 285.)

Plaintiff visited the Mineral Area Hospital on March 16, 2006, and complained of pain in the right lower quadrant of the abdomen radiating to the back.  Plaintiff reported that she also began experiencing nausea and vomiting two weeks prior. Plaintiff's current medications were noted to include Entocort Zantac, Reglan, Dilantin, and Sulfasalazine.  Plaintiff's medical history was noted to include ulcerative colitis, Crohn's disease and rheumatoid arthritis.  Plaintiff was noted to smoke two packs of cigarettes a day.  Plaintiff reported suffering from depression. Plaintiff reported having no migraine or cluster-type headaches. Plaintiff reported having arthritic pain in her hands, legs, left hip, and toes.  Physical examination of the abdomen showed mild rebound and positive McBurney's test.[24]  Bowel sounds were noted to

---

[24]Point tenderness between the naval and iliac crest; pressure over this point will cause pain in people with symptoms of appendicitis.  Medline Plus, *Point Tenderness-Abdomen* (updated May 17, 2007)<http://www.nlm.nih.gov/medlineplus/ency/article/003273.

be normal. Dr. L. Lum diagnosed plaintiff with right lower quadrant abdominal pain, Crohn's disease, ulcerative colitis, tobacco abuse, mitral valve prolapse, depression, and rheumatoid arthritis. Dr. Lum determined to admit plaintiff for further evaluation and treatment. (Tr. 269-75.) A CT scan of the abdomen and pelvis taken that same date was normal. (Tr. 276.)

Plaintiff returned to Dr. Swaroop on June 6, 2006, and reported that she was experiencing debilitating diarrhea with constant lower abdominal pain. Plaintiff reported experiencing eight to ten diarrhea episodes a day as well as having nocturnal symptoms. Plaintiff reported that she also experienced constant nausea with vomiting of bile. Dr. Swaroop noted that treatment with Entocort had failed. Plaintiff's current medications were noted to include Dilantin and hormone replacement therapy. Plaintiff currently weighed 158 pounds. Physical examination of the abdomen showed plaintiff to experience pain in the left and right lower quadrants. Dr. Swaroop observed plaintiff not to be responding to traditional medications for lymphocytic colitis. Dr. Swaroop questioned whether plaintiff suffered celiac sprue or whether there may be endocrine causes of her diarrhea. Further testing was ordered and Cipro[25] was prescribed for possible small bowel bacterial overgrowth. (Tr. 220-21, 235-36.) Plaintiff was

htm>.

[25]Cipro is indicated for the treatment of infections. Physicians' Desk Reference 848 (55th ed. 2001).

instructed to return in one month for follow up.

On June 9, 2006, plaintiff underwent endoscopy and biopsy at St. Louis University Hospital which showed no pathologic diagnosis of the small intestine, duodenum, colon, or sigmoid. (Tr. 250-51.) A sigmoidoscopy performed that same date showed normal esophagus, stomach and duodenal folds. Dr. Swaroop noted the stomach wall to be normally distensible. (Tr. 247.)

In a Physical Residual Functional Capacity questionnaire completed on June 24, 2006, Dr. Swaroop noted plaintiff to be diagnosed with lymphocytic colitis and suffered from abdominal pain and diarrhea as a result. Dr. Swaroop described plaintiff's pain to be occasionally severe and to be located in the middle of her abdomen. Dr. Swaroop determined plaintiff's prognosis to be good. Dr. Swaroop opined that plaintiff's condition had lasted or could be expected to last at least twelve months. Dr. Swaroop opined that emotional factors, and specifically, anxiety, contributed to the severity of plaintiff's symptoms and functional limitations. Dr. Swaroop opined that plaintiff's pain or other symptoms were occasionally severe enough to interfere with attention and concentration needed to perform simple work tasks. Dr. Swaroop opined that plaintiff was capable of performing low stress jobs, noting that plaintiff's symptoms appeared worse during stressful situations. Dr. Swaroop opined that plaintiff could sit or stand up to thirty minutes at one time; could stand or walk a total of

less than two hours in an eight-hour work day; and could sit for a total of about two hours in an eight-hour work day. Dr. Swaroop opined that plaintiff needed periods of walking around during an eight-hour work day. Dr. Swaroop opined that plaintiff needed a sit/stand/walking option with her work. Dr. Swaroop further opined that plaintiff would sometimes need to take unscheduled breaks during an eight-hour work day, and that such breaks could occur every thirty minutes or every few hours and could last up to ten to fifteen minutes. Dr. Swaroop opined that plaintiff could frequently lift up to ten pounds and could occasionally lift twenty pounds. Dr. Swaroop opined that plaintiff could rarely twist, stoop, bend, crouch, and squat but could occasionally climb ladders and stairs. Dr. Swaroop noted that plaintiff's condition could produce good days and bad days and opined that plaintiff would likely be absent from work more than four days each month due to her impairment. Dr. Swaroop noted that plaintiff's impairment existed at the current level since November 2005 when she was first diagnosed with lymphocytic colitis. (Tr. 215-19.)

Plaintiff was admitted to the emergency room at Mineral Area Medical Center on August 17, 2006, after having been involved in a motor vehicle accident. It was reported that after the collision, plaintiff became upset while talking to the police and began experiencing seizure activity but that such activity had resolved. Plaintiff's last seizure was noted to have occurred one

year prior. Plaintiff currently complained of fatigue and of mild left shoulder pain. Plaintiff's psychological state was noted to be appropriate. An x-ray of the left clavicle was negative. Plaintiff was given Extra Strength Tylenol and was provided a sling. Plaintiff was discharged that same date in improved and stable condition. Upon discharge, plaintiff was instructed to take her Dilantin, to apply an ice pack to her shoulder, and to follow up with her primary physician the following day. (Tr. 203-14.)

An x-ray of plaintiff's left shoulder taken September 11, 2006, was negative. (Tr. 201.) An ultrasound of plaintiff's thyroid performed that same date was negative. (Tr. 202.)

## IV. The ALJ's Decision

The ALJ found that plaintiff had engaged in substantial gainful activity since July 5, 2005, the alleged onset date of disability. The ALJ found the combination of plaintiff's impairments of lymphocytic colitis, seizures, anxiety disorder, and possible borderline intellectual functioning to be severe, but that plaintiff's impairments, either singly or in combination, did not meet or medically equal one listed in 20 C.F.R. Part 404, Subpart P, App. 1. The ALJ found plaintiff to be less than fully credible. The ALJ determined that plaintiff had the residual functional capacity (RFC) to engage in work-related activities except that she was precluded from any exposure to hazardous work settings, unprotected heights and dangerous and/or moving machinery; and from

performing more than simple, repetitive work. The ALJ determined that plaintiff had no past relevant work. Considering plaintiff's age, education, work experience, RFC, and non-exertional limitations, the ALJ determined that plaintiff was able to perform work existing in significant numbers in the national economy, and specifically, sedentary table work and light cleaning jobs. As such, the ALJ found plaintiff not to be under a disability since the filing of her application for benefits, that is, September 22, 2005. (Tr. 12-19.)

## V. Discussion

To be eligible for Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42
U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the
Commissioner engages in a five-step evaluation process.  See 20
C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).
The Commissioner begins by deciding whether the claimant is engaged
in substantial gainful activity.  If the claimant is working,
disability benefits are denied.  Next, the Commissioner decides
whether the claimant has a "severe" impairment or combination of
impairments, meaning that which significantly limits her ability to
do basic work activities.  If the claimant's impairment(s) is not
severe, then she is not disabled.  The Commissioner then determines
whether claimant's impairment(s) meets or is equal to one of the
impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If
claimant's impairment(s) is equivalent to one of the listed
impairments, she is conclusively disabled.  At the fourth step, the
Commissioner establishes whether the claimant can perform her past
relevant work.  If so, the claimant is not disabled.  Finally, the
Commissioner evaluates various factors to determine whether the
claimant is capable of performing any other work in the economy.
If not, the claimant is declared disabled and becomes entitled to
disability benefits.

The decision of the Commissioner must be affirmed if it
is supported by substantial evidence in the record as a whole.  42

U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's

findings may still be supported by substantial evidence. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff argues that the ALJ erred in finding plaintiff not to be credible and erred in his failure to accord proper weight to the opinions of Dr. Mayfield and Dr. Swaroop. The Court will address each of plaintiff's contentions in turn.

A.   <u>Credibility Determination</u>

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in

the evidence as a whole.  Id.

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004).  It is not enough that the record merely contain inconsistencies.  Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld.  Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001); see also Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  The determination of a claimant's credibility is for the Commissioner, and not the Court, to make.  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Pearsall, 274 F.3d at 1218.

In this cause, the ALJ cited to what he considered to be numerous inconsistencies in the record to support his finding that plaintiff was not credible.  First, the ALJ noted the objective medical evidence not to support plaintiff's complaints of debilitating symptoms, specifically noting that other than the

biopsy showing lymphocytic colitis, most of the objective testing yielded fairly benign results. See Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) (ALJ may consider contrary medical evidence in determining credibility of plaintiff's subjective complaints). The ALJ also found that contrary to plaintiff's complaints of being miserable and in constant pain, her treating sources observed plaintiff not to be in acute distress. The ALJ also noted plaintiff not to appear so miserable or in pain at the administrative hearing in the cause. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (ALJ's personal observation of plaintiff during the hearing is a factor to be considered in assessing credibility). The ALJ also found there to be some question as to whether plaintiff suffered from seizures and that, at least, there was little evidence of severe ongoing seizures. The ALJ noted early testing showed results consistent with borderline intellectual functioning, but that the consultative psychological evaluation as well as the ALJ's observation of plaintiff at the hearing showed her not to be intellectually impaired. See Goff, 421 F.3d at 793. The ALJ also noted that despite plaintiff's complaints of a psychiatric condition, she had not seen a psychiatrist, psychologist or mental health counselor. See Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (ALJ entitled to discount complaints based on failure to seek treatment). The ALJ also noted that psychiatric observations made

in treatment settings consistently showed plaintiff's psychological status to be normal and appropriate. The ALJ also noted that despite plaintiff's claim that she cannot walk, she was advised to walk at least thirty minutes a day. The ALJ also noted that despite plaintiff's claim to Dr. Swaroop that her August 2005 colonoscopy showed a blockage, there was no diagnostic evidence of any such blockage. The ALJ also noted that plaintiff claimed at the hearing that she had Crohn's disease despite not having been diagnosed with the condition. The ALJ also noted that despite plaintiff's claim to Dr. Swaroop in June 2006 that she had been experiencing eight to ten diarrhea episodes a day, she had in fact gained seventeen pounds since the previous December. The ALJ also noted plaintiff's work history to detract from her credibility in that her earnings had been very low and, further, that she had been able to work at the substantial gainful activity level during the third quarter of 2005 despite her alleged disability. See Comstock, 91 F.3d at 1147 (low earnings, significant breaks in employment, and engaging in work activity during period of alleged disability cast doubt on complaints of disabling symptoms). Finally, the ALJ noted that despite being advised to stop smoking, plaintiff currently smoked two to three packs of cigarettes a day.

Plaintiff argues that the ALJ's adverse credibility determination is flawed inasmuch as he erroneously perceived plaintiff's report to Dr. Swaroop that testing showed intestinal

blockage to be untrue and erroneously perceived her claim of suffering from Crohn's disease to be untrue. The undersigned agrees that the evidence of record supports plaintiff's argument that it would be reasonable for a layman, non-medical professional such as herself to have reported to Dr. Swaroop in December 2005 that recent testing showed intestinal blockage inasmuch as a November 2005 obstructional series showed significant fecal stasis, or stoppage of intestinal contents. Further, it is also reasonable for plaintiff to have believed that she had been diagnosed with Crohn's disease inasmuch as in November 2005, Gastroenterologist Swaroop indeed questioned whether she had the disease and prescribed medication for the disease. To the extent the ALJ's credibility analysis was deficient by his consideration of these ill-perceived factors, there nevertheless existed additional significant inconsistencies in the record to detract from plaintiff's credibility, as set out above. Inasmuch as the ALJ's conclusion as to plaintiff's credibility continues to be supported by substantial evidence on the record, any error in his consideration of plaintiff's reports of intestinal blockage and Crohn's disease does not require the determination to be set aside. See Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).

Plaintiff further argues that the ALJ erred in his credibility analysis by finding Nurse Block's advice to plaintiff that she walk for thirty minutes to be inconsistent with her claim

that she was unable to walk. Plaintiff specifically contends that this consideration constituted error inasmuch as the advice came from a nurse practitioner and not a doctor, was given in response to plaintiff's complaints of weight gain, and was contrary to Dr. Swaroop's June 2006 opinion that plaintiff may need to engage in periods of walking while working for up to fifteen (not thirty) minutes. The ALJ did not err in considering Nurse Block's advice. First, evidence from medical sources such as nurse-practitioners may be considered in determining the severity of a claimant's impairments and the effect such impairments have on a claimant's ability to work. 20 C.F.R. § 416.913(d)(1). Further, although the initial advice may have been given in response to concerns regarding plaintiff's weight gain, it would be incongruent for this treating medical professional to advise plaintiff to engage in such activity, regardless of the reason, if plaintiff was nevertheless physically unable to do so. Indeed, plaintiff reported to Nurse Block, without complaint, that she engaged in continuous walking at work. In addition, the undersigned notes that such advice was given at a time when plaintiff was reporting to Nurse Block the same or similar complaints she subsequently reported to Dr. Swaroop, namely chronic abdominal pain, cramping and chronic diarrhea. Finally, to the extent plaintiff argues that the ALJ did not consider Dr. Swaroop's fifteen-minute walking limitation as described in his RFC Assessment, the ALJ properly discounted such

findings made in this Assessment.  <u>See</u> discussion <u>infra</u> at Section
V.B.

Finally, plaintiff contends that the ALJ improperly
relied on plaintiff's failure to stop smoking in his determination
to find plaintiff's complaints not to be credible inasmuch as there
was no evidence that smoking cessation would improve plaintiff's
impairments.  Plaintiff's argument is misplaced.  Here, the ALJ
analyzed the evidence of plaintiff's failure to comply with
physician directives solely to weigh the credibility of her
subjective complaints, and not as a basis upon which to deny
benefits.  This use of evidence of failure to comply with treatment
recommendations, without determining whether such treatment would
restore plaintiff's ability to work, is permissible.  <u>Holley v.</u>
<u>Massanari</u>, 253 F.3d 1088, 1092 (8th Cir. 2001); 20 C.F.R. §
416.930.

A review of the ALJ's decision shows that, in a manner
consistent with and as required by <u>Polaski</u>, the ALJ considered
plaintiff's subjective complaints on the basis of the entire record
before him and set out numerous inconsistencies detracting from
plaintiff's credibility.  The ALJ may disbelieve subjective
complaints where there are inconsistencies on the record as a
whole.  <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990).
Because the ALJ's determination not to credit plaintiff's
subjective complaints is supported by good reasons and substantial

evidence, this Court must defer to the ALJ's credibility determination. <u>Goff</u>, 421 F.3d at 793; <u>Vester v. Barnhart</u>, 416 F.3d 886, 889 (8th Cir. 2005); <u>Gulliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005).

B.    <u>Weight Given to Physician Opinions</u>

Plaintiff claims that the ALJ erred in his failure to accord proper weight to the opinions of consulting psychologist Dr. Mayfield and plaintiff's treating physician, Dr. Swaroop.

1.    *RFC Assessment of Treating Physician Dr. Swaroop*

The Regulations require the Commissioner to give more weight to the opinions of treating physicians than other sources. 20 C.F.R. § 416.927(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2); <u>see also</u> <u>Forehand v. Barnhart</u>, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from

reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 416.927(d)(2).

Opinions of treating physicians do not automatically control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). The ALJ may discount or disregard such opinions if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Hogan, 239 F.3d at 961.

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, with such factors including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. § 416.927(d)(2). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." Id. Inconsistency with other evidence alone is sufficient to discount

a treating physician's opinion.  <u>Goff</u>, 421 F.3d at 790-91.

In this cause, the ALJ recognized Dr. Swaroop to be plaintiff's treating physician and noted the extensive diagnostic testing and findings resulting therefrom.  (Tr. 15, 16-17.) Despite Dr. Swaroop's area of specialty and extensive testing, and upon consideration of other § 927(d)(2) factors, the ALJ determined to accord little weight to Dr. Swaroop's June 2006 RFC Assessment wherein he found plaintiff to be severely restricted in her ability to perform work-related activities.  For the following reasons, the ALJ's determination is supported by substantial evidence.

In his June 2006 Assessment, Dr. Swaroop indicated that plaintiff's physical limitations would permit her to sit or stand for only up to thirty minutes at one time; to stand or walk a total of less than two hours in an eight-hour work day; to sit for a total of about two hours in an eight-hour work day; and that she needed periods of walking around throughout the day.  As noted by the ALJ, these limitations do not appear elsewhere in Dr. Swaroop's treatment notes and, as further noted by the ALJ, are not supported by any objective testing.  Where the limitations set out in a treating physician's RFC Assessment stand alone, were never mentioned in the physician's numerous treatment records, and are not supported by any objective testing or reasoning which would indicate why the claimant's functioning is so restricted, an ALJ does not err in discounting those portions of the Assessment which

are inconsistent and unsupported.  Strongson v. Barnhart, 361 F.3d 1066, 1071 (8th Cir. 2004); Hogan, 239 F.3d at 961; see also Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007); Randolph v. Barnhart, 386 F.3d 835, 841 (8th Cir. 2004) (only evidence that claimant met criteria for disability was treating source's cursory checklist).

        To the extent plaintiff argues that the ALJ should have recontacted plaintiff's treating physician for additional or clarifying information, the undersigned notes that an ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.  Goff, 421 F.3d at 791 (citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). While the Regulations provide that the ALJ should recontact a treating physician in some circumstances, "that requirement is not universal."  Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006). Instead, the Regulations provide that the ALJ should recontact medical sources "[w]hen the evidence [received] from [the claimant's] treating physician or psychologist or other medical source is inadequate" for the ALJ to determine whether the claimant is disabled.  20 C.F.R. § 416.912(e).  The Regulations do not require an ALJ to recontact a treating physician whose opinion is inherently contradictory or unreliable.  Hacker, 459 F.3d at 938. "This is especially true when the ALJ is able to determine from the record whether the applicant is disabled."  Id. (citing Sultan v.

Barnhart, 368 F.3d 857, 863 (8th Cir. 2004) (there is no need to recontact a treating physician where the ALJ can determine from the record whether the claimant is disabled)).

In this case, the issue was not whether Dr. Swaroop's RFC Assessment was somehow inadequate, unclear or incomplete. Instead, the ALJ found the exertional limitations stated therein not to be supported by Dr. Swaroop's own treatment notes or diagnostic testing. An ALJ is under no obligation to recontact the treating physician under such circumstances. Hacker, 459 F.3d at 938; Goff, 421 F.3d at 791. The ALJ therefore did not err in failing to recontact plaintiff's treating physician to obtain additional or clarifying information.

2. *Opinion of Consulting Psychologist Dr. Mayfield*

In February 2006, Dr. Mayfield conducted a psychological evaluation of plaintiff for disability determinations whereupon he determined, inter alia, that plaintiff's ability to cope with stress and pressures of routine work activities was markedly impaired. Plaintiff claims that the ALJ erred by discounting this opinion of Dr. Mayfield and argues that such marked impairment precludes plaintiff from performing any work in the national economy.

As a general matter, the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole. Wagner, 499 F.3d at 849;

Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000).  This is especially true where such report contradicts or is inconsistent with other substantial evidence of record.  Howe v. Astrue, 499 F.3d 835, 840-41 (8th Cir. 2007).  Here, the ALJ found that Dr. Mayfield's opinion was contrary to observations made within various of plaintiff's treatment settings that plaintiff's psychological status was consistently found to be unremarkable, normal or appropriate.  In addition, Dr. Swaroop, plaintiff's treating physician, opined that plaintiff was capable of performing low stress jobs.  Such a finding would appear to be inconsistent with Dr. Mayfield's opinion of a marked impairment in this area.  See Wagner, 499 F.3d at 849 (ALJ must resolve conflict between opinions of treating and consulting physicians).  Finally, the GAF score of 55 assigned by Dr. Mayfield, indicating only moderate symptoms, likewise appears to be inconsistent with his own opinion of marked limitations.  See Flynn v. Astrue, 513 F.3d 788, 793-94 (8th Cir. 2008) (ALJ properly discounted physician's opinion because of its internal inconsistencies).

As demonstrated above, the ALJ gave appropriate weight to those opinions of Dr. Swaroop and Dr. Mayfield regarding plaintiff's ability to engage in work-related activities and provided good reasons for according such weight.  If two inconsistent positions may be drawn from the evidence and one of those positions represents the ALJ's findings, the Court must

affirm the decision.  <u>Goff</u>, 421 F.3d at 789.

## VI.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied.  Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist in the record that would have supported a contrary outcome or because another court could have decided the case differently.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992).  Accordingly, the decision of the Commissioner denying plaintiff's claims for benefits should be affirmed.

Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.



UNITED STATES MAGISTRATE JUDGE

Dated this _30th_ day of September, 2008.